**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **CORNERSTONE CHURCH OF NASHVILLE, INC.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 3:20-cv-00956** |
| **v.** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **GUIDEONE INSURANCE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court is the Rule 12(b)(6) Motion to Dismiss Complaint filed by defendant GuideOne Insurance ("GuideOne"). (Doc. No. 8.) For the reasons set forth herein, the motion will be granted in part and denied in part.

## I.     STANDARD OF REVIEW

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556. According to the Supreme Court, "plausibility" occupies that wide space between "possibility" and "probability." *Iqbal*, 556 U.S. at 678. If a reasonable court can draw the necessary inference from the factual material stated in the complaint, the plausibility standard has been satisfied.

Generally, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). At the same time, however, it has long been the rule that a court may consider, not only the Complaint and exhibits attached to it, but also exhibits attached to defendant's motion to dismiss, "so long as they are referred to in the Complaint and are central to the claims contained therein." *Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 694 (6th Cir. 2018) (citation omitted).

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Cornerstone Church of Nashville, Inc. ("Cornerstone" or "the church") filed the Complaint ("removed Complaint") initiating this action in the Chancery Court for Davidson County, Tennessee. (Doc. No. 1-2.) Defendant GuideOne removed the case to federal court on November 6, 2020 on the basis of diversity jurisdiction. Cornerstone is a Tennessee non-profit corporation based in Madison, Tennessee, and GuideOne is an insurance company doing business in Tennessee but whose principal place of business is in Iowa. (Doc. No. 1-2 ¶¶ 1, 2.) The amount

in controversy exceeds $75,000.

In 2016, an individual named Clint Arnold initiated a lawsuit ("Lawsuit" or "underlying Lawsuit") by filing a complaint ("2016 complaint" or "Arnold's complaint") naming Cornerstone as a defendant and alleging that Arnold had been sexually assaulted by an agent of the church—a member of Cornerstone's Youth Staff named Brian Mitchell—in the summer of 2008, when Arnold was eleven years old. (*Id.* ¶ 5; *see also* Doc. No. 9-1 ¶¶ 20, 25–27, 29.[1]) According to the 2016 complaint, Arnold did not tell anyone about the abuse at the time it occurred. (Doc. No. 9-1 ¶ 28.) However, in the fall of 2008, Arnold's mother discovered inappropriate text messages from Mitchell on her son's phone. (*Id.* ¶ 30.) She brought these messages to the attention of church officials, who told her that they would "take care of" the situation. (*Id.* ¶ 31.) No action was taken, however, and Mitchell was permitted to "reappear" at Cornerstone events between 2008 and 2010, causing Arnold severe emotional distress. (*Id.* ¶ 34.) In 2014, Arnold disclosed to a therapist that he had been sexually abused in 2008. The therapist referred him to the Tennessee Department of Children's Services, and a police investigation was opened. Ultimately, Mitchell was arrested and prosecuted on charges of aggravated sexual battery and rape of a child, among other offenses. As of 2016, he remained incarcerated. (*Id.* ¶ 36.)

Arnold's complaint set forth claims against Cornerstone for negligence and reckless and/or intentional infliction of emotional distress, based both on Cornerstone's conduct that allegedly caused or contributed to the sexual assault (*i.e.*, negligent hiring) and on conduct that took place after the assault, including Cornerstone's alleged failure to implement policies to protect other

---

[1] Although the plaintiff did not attach the 2016 complaint as an exhibit to the removed Complaint, GuideOne attached a copy of it to its Motion to Dismiss. As it was clearly referenced and central to the claims asserted in the removed Complaint, the court may consider the 2016 complaint without treating the present motion as one for summary judgment.

children from sexual abuse and failure to "fully investigate and report Defendant Mitchell's suspicious and inappropriate behavior to law enforcement authorities." (*Id.* ¶¶ 47, 50.)

Cornerstone was insured by GuideOne in 2007–08, when the sexual abuse occurred. (Doc. No. 1-2 ¶ 4.) The policy in effect at that time ("Policy") provided a "General Aggregate Limit" on Commercial General Liability ("CGL") of $3,000,000, with a $1,000,000 liability limit per occurrence. (Doc. No. 9-2, at 78.)[2] Under "Coverage A" of the CGL Coverage Form, for "Bodily Injury and Property Damage," GuideOne had an obligation to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies," as well as the "right and duty to defend the insured against any 'suit' seeking those damages." (*Id.* at 93.) Under section I.2.p. of the CGL form, any injury or damage arising from "Additional Exclusions" identified in the Policy were not covered. (*Id.* at 93, 96.) Under the section entitled Additional Exclusions, "[a]ny . . . 'bodily injury' and mental or emotional pain or anguish, sustained by any person *arising out of or resulting from any actual or alleged act of sexual misconduct of any kind*" was expressly excluded from CGL coverage (the "sexual misconduct exclusion"). (*Id.* at 99 (emphasis added).)

At the same time, the Policy incorporated a separate rider providing coverage for liability for sexual misconduct, in the maximum amount of $500,000 per occurrence. (*Id.* at 79, 87.) Under the Sexual Misconduct Liability Coverage Form (the "SML rider"), GuideOne agreed to cover Cornerstone's "legal liability for damages because of bodily injury [and] mental anguish or emotional distress sustained by a person as a result of sexual misconduct which first commences during the policy period." (*Id.* at 87.) This duty incorporated a duty to defend any suit brought

---

[2] Again, the plaintiff did not attach a copy of the Policy to the removed Complaint, but the court will consider the copy attached as an exhibit to the Motion to Dismiss.

against Cornerstone seeking such damages and to "make any settlement we deem expedient." (*Id.*)

GuideOne provided a defense to Cornerstone in the underlying Lawsuit, and a settlement was reached before the case proceeded to trial. Regarding that settlement, Cornerstone alleges that, "in reliance upon representations made by counsel for GuideOne," it entered into a settlement agreement with Arnold that resolved and settled all claims at issue in the underlying Lawsuit in exchange for a payment to Arnold of $1,000,000. (Doc. No. 1-2 ¶¶ 8, 9.) Cornerstone alleges that counsel for GuideOne specifically represented that "GuideOne would pay for coverage in the full amount of $500,000 for the sexual misconduct by an agent of the church and for an additional $500,000 under the [CGL] which could be sought after the settlement in the Lawsuit was completed due to 'time being of the essence to finalize said settlement and to avoid a trial.'" (*Id.* ¶ 9 (interior quotation marks in the original).) The settlement was consummated, with GuideOne and Cornerstone each paying Arnold $500,000. Afterward, however, GuideOne denied any liability for reimbursing Cornerstone for the $500,000 the church had paid out of pocket, asserting that the insurance company's liability under the Policy was limited to $500,000 per occurrence for sexual misconduct. (*Id.* ¶ 10.)

The removed Complaint alleges that the Lawsuit "encompassed claims other than those of sexual misconduct, such as failure to report suspected child abuse and negligent hiring of a church employee, among others" and that "GuideOne committed substantial and material breaches of its contractual obligations under the Policy by wrongfully denying full coverage." (*Id.* ¶¶ 10, 14.) Cornerstone seeks a declaratory judgment, an injunction compelling specific performance of the Policy, and a money judgment in the amount of $500,000. Cornerstone also asserts that GuideOne acted in bad faith in denying coverage provided by the Policy, thus entitling the church to recover an additional 25% penalty, under Tenn. Code Ann. § 56-7-105(a).

In lieu of an answer, GuideOne filed the Motion to Dismiss (Doc. No. 8) and supporting Memorandum (Doc. No. 9), along with copies of both the 2016 complaint and the Policy (Doc. Nos. 9-1, 9-2). The plaintiff has filed a Response opposing the motion (Doc. No. 15), and the defendant filed a Reply (Doc. No. 16.)

## III.  DISCUSSION

### A.  The Parties' Arguments

GuideOne interprets the removed Complaint as asserting a single claim for breach of the Policy in connection with GuideOne's failure to reimburse Cornerstone for the $500,000 settlement payment it made out of pocket, plus a claim under Tenn. Code Ann. § 56-7-105 for bad faith failure to pay a claim. GuideOne seeks dismissal of the Complaint on the basis that all of the claims against Cornerstone in the underlying Lawsuit "arose from alleged vicarious liability from its employer/agent for sexually abusing a child and alleged negligence (breaches of duties) contributing to the sexual abuse"—claims that, it argues, are excluded from coverage under the CGL policy and covered only by the SML rider, with its $500,000 per-occurrence policy limit, which GuideOne paid. (Doc. No. 9, at 15.) It further argues that the facts as alleged in the Complaint fail to give rise to an inference that GuideOne acted in bad faith.

In response, the plaintiff insists that the Complaint adequately alleges that Arnold's claims in the 2016 complaint were based, not only on conduct directly contributing to the sexual abuse, but also on conduct that took place after the abuse, including Cornerstone's after-the-fact failure to "implement[] Church policies and procedures to safeguard children and minimize the risk of sexual abuse" and failure to "fully investigate and report Mitchell's suspicious and inappropriate behavior to law enforcement authorities." (Doc. No. 15, at 5 (quoting Doc. No. 9-2 ¶¶ 5, 11); *see also* Doc. No. 9-2 ¶¶ 47, 50.) Cornerstone's position is that the claims relating to the church's conduct *after* Mitchell's sexual misconduct ended are unrelated to that conduct and, therefore,

were not excluded by the sexual misconduct exclusion. It also asserts that it has adequately alleged bad faith.

In addition, Cornerstone argues that the removed Complaint states a claim for promissory estoppel. It points to allegations that it relied on representations made by counsel for GuideOne in entering into the settlement agreement with Arnold that

> GuideOne would pay for coverage in the full amount of $500,000 for sexual misconduct by an agent of the church and for an additional $500,000 under the general liability limits which could be sought after the settlement in the Lawsuit was completed due to "time being of the essence to finalize said settlement and to avoid a trial."

(Doc. No. 1-2 ¶ 9; Doc. No. 15, at 5–6.) After the settlement was consummated, however, GuideOne denied further coverage, stating that its liability was limited to $500,000 under the Sexual Misconduct rider. (Doc. No. 1-2 ¶ 10.)

In its Reply, GuideOne again argues that all of the plaintiff's claims arise from and are related to Mitchell's sexual misconduct and, therefore, are subject to the sexual misconduct exclusion. It also asserts that the Complaint fails to state a colorable claim for promissory estoppel under Tennessee law.

 **B.**  **Analysis**

   *1.*  *Breach of Contract*

Under Tennessee law, insurance policies are contracts. *Powell v. Clark*, 487 S.W.3d 528, 534 (Tenn. Ct. App. 2015). "In a breach of contract action, claimants must prove the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011).

"The question of the extent of insurance coverage is a question of law involving the interpretation of contractual language." *Clark v. Sputniks*, LLC, 368 S.W.3d 431, 441 (Tenn. 2012); *see also Charles Hampton's A-1 Signs, Inc. v. Am. States Ins. Co.*, 225 S.W.3d 482, 487

(Tenn. Ct. App. 2006) ("The interpretation of an insurance policy is a question of law and not fact"). "Insurance contracts are 'subject to the same rules of construction as contracts generally,' and in the absence of fraud or mistake, the contractual terms 'should be given their plain and ordinary meaning, for the primary rule of contract interpretation is to ascertain and give effect to the intent of the parties.'" *Clark*, 368 S.W.3d at 441 (quoting *U.S. Bank, N.A. v. Tenn. Farmers Mut. Ins. Co.*, 277 S.W.3d 381, 386-87 (Tenn. 2009)). Exclusions and limitations in insurance policies "must be construed against the insurance company and in favor of the insured." *Allstate Ins. Co. v. Watts*, 811 S.W.2d 883, 886 (Tenn. 1991). These clauses should not, however, "be so narrowly construed as to defeat their evident purpose." *Capitol Indem. Corp. v. Braxton*, 24 F. App'x 434, 439 (6th Cir. 2001) (citation omitted).

The 2016 complaint's assertion that the church was directly liable for Mitchell's sexual misconduct was premised largely on allegations of negligent hiring, negligent supervision, and reckless disregard of the church's own policies, which caused or contributed to the sexual misconduct. (*See* Doc. No. 9-1 ¶¶ 46, 50.) The sexual misconduct exclusion clearly excluded coverage related to these claims, insofar as it disclaimed any obligation to settle, defend, or pay any claim or lawsuit "asserting any act of sexual misconduct or *any breach of duty contributing to such act*." (Doc. No. 9-2, at 99.) Conversely, the SML rider expressly provided legal liability for "mental anguish or emotional distress sustained by a person as a result of sexual misconduct," subject to the $500,000 per-occurrence limit. The Policy states that "all acts of sexual misconduct by one person, or two or more persons acting together, or *any breach of duty causing or contributing to such acts*, will be considered one occurrence in determining [GuideOne's] liability under this section." (*Id.* at 87 (emphasis added).) Allegations that church officials' negligent hiring, negligent supervision, and reckless (or negligent) failure to follow church policy caused or

contributed to the sexual assault by Mitchell clearly fell within the scope of the SML rider.

Although Cornerstone alleges in the removed Complaint that the claim in the 2016 complaint for "negligent hiring of a church employee" did not fall within the scope of the SML rider, Cornerstone now appears to have abandoned that (untenable) position, arguing only that claims regarding conduct that took place after the sexual misconduct occurred are not encompassed by the SML rider or the sexual misconduct exclusion. In the removed Complaint and in its Response to the Motion to Dismiss, Cornerstone alleges that the 2016 complaint asserted at least two such claims: (1) that the church failed to "implement[] Church policies and procedures" to protect *other* children and thereby "minimize the risk of sexual abuse" to "similarly vulnerable" children, after the abuse of Arnold had already taken place, and (2) that the church failed to "fully investigate and report Mitchell's suspicious and inappropriate behavior to law enforcement authorities," after the abuse had terminated but Arnold's mother brought to the attention of church authorities the inappropriate text messages from Mitchell to Arnold. (Doc. No. 15, at 5 (quoting Doc. No. 1-2 ¶¶ 5, 11); Doc. No. 9-1 ¶¶ 47, 50.) The defendant argues in its Reply only that the referenced claims are clearly related to the sexual misconduct and that any liability for these alleged failures could not logically be distinct from Cornerstone's legal liability for damages resulting from the sexual misconduct. (Doc. No. 16, at 6–7.)

Regarding the claim that the church failed to implement policies to protect *other* children from *future* abuse by Mitchell or others, the court readily concludes that, regardless of whether this claim was independent of the sexual misconduct claims, Arnold clearly lacked standing to bring claims on behalf of other children and, more to the point, did not allege that he suffered damages resulting from the church's alleged after-the-fact failure to implement measures to prevent future abuse to other children of the type Arnold had already suffered. *See Lourcey v.*

*Estate of Scarlett*, 146 S.W.3d 48, 52 (Tenn. 2004) (observing that "injury or loss" is one of the necessary elements of a general negligence claim). As a result, it is simply implausible to conclude that any portion of the settlement pertained to this facially invalid claim.

The same analysis, however, does not necessarily apply to the plaintiff's claim that church officials negligently or recklessly failed to report suspected abuse to the Tennessee Department of Children's Services or law enforcement officials, as a result of which Mitchell was allowed to continue to participate in church activities from 2008 through 2010, causing Arnold "severe emotional distress." (Doc. No. 9-1 ¶¶ 33, 34.) Clearly, the failure to report suspected abuse did not cause or contribute to the sexual abuse itself, as Arnold did not allege continued abuse after the summer of 2008. GuideOne's argument is that the alleged obligation to report child sexual abuse itself arose from the abuse and that any emotional distress suffered by Arnold arose out of or resulted from the sexual misconduct, thus falling within the scope of the sexual misconduct exclusion and under the SML rider's coverage limit.

Neither party points to any caselaw in support of its position, but it appears that the Tennessee Supreme Court has adopted the doctrine of concurrent cause and, in the same context, defined the term "arising out of," as used in insurance policies, more narrowly than other jurisdictions. Many other jurisdictions have broadly applied a "but for" definition of causation in this context. *See, e.g.*, *Madison Square Boys & Girls Club, Inc. v. Atl. Speciality Ins. Co.*, 140 N.Y.S.3d 357, 369 (N.Y. Sup. Ct. 2020) ("To determine the applicability of an 'arising out of' exclusion, the Court of Appeals had adopted a 'but for' test defined as follows: '[I]f the plaintiff in an underlying action or proceeding alleges the existence of facts clearly falling within such an exclusion, and none of the causes of action that he or she asserts could exist but for the existence of the excluded activity or state of affairs, the insurer is under no obligation to defend the action.'"

(citations omitted)); *Bagley v. Monticello Ins. Co.*, 720 N.E.2d 813, 816 (Mass. 1999): ("Indeed, cases interpreting the phrase 'arising out of' in insurance exclusionary provisions suggest a causation more analogous to 'but for' causation . . . ." (citations omitted)).

However, unlike many other state courts, in *Allstate Insurance Co. v. Watts*, 811 S.W.2d 883 (Tenn. 1991), the Tennessee Supreme Court rejected such a broad definition in favor of the concurrent cause doctrine. *Id.* at 887. In that case, a homeowner's insurance company brought a declaratory judgment action to determine whether its policy provided coverage for injuries sustained by an invitee of the insured, who was injured when he stopped by to visit and ended up assisting the insured in performing work on a vehicle in the insured's garage. The policy at issue contained an exclusion for injuries arising out of the maintenance of a motor vehicle. The injuries in that case were incurred when the insured's friend, after being assured that there were no flammable liquids in the garage, used a welding torch to attempt to cut lug bolts from a wheel of the vehicle. Sparks flew and ignited a nearby pan of oil. The insured picked up the pan to take it outside of the garage but dropped it because it was hot and then kicked it, causing flammable liquid to splash on his friend, igniting his clothes and causing severe burns. The friend brought suit, alleging that the insured was negligent in erroneously informing him there were no flammable substances in the garage. The insurer, Allstate, maintained that the injuries were excluded because they "arose out of" the maintenance of an automobile. *Id.* at 885.

Following a bench trial, the trial court found that the injuries had two proximate causes: (1) using the torch on the vehicle, which was an excludable risk under the policy; and (2) "the negligence of the [insured] in failing to warn and ultimately kicking the pan, which was a nonvehicle related risk which would not fall within the exclusion." *Id.* The chancellor held that coverage should be provided, in part because "the efficient and predominating cause of the

accident was not the maintenance of the vehicle, but the apparent negligence of [the insured] in the placement of the flammable liquid and the failure to warn [the friend] of the substance." *Id.* at 885 n.1. The Tennessee Court of Appeals reversed, applying a but-for causation standard and finding that, "[i]rrespective of whether or not [the insured] was guilty of negligence in leaving a pan of flammable liquid in the garage and not so advising [his friend], if the sparks from [the] cutting torch had not set the chain of events in motion, the injuries and damages sustained by [the friend] would not have occurred." *Id.* at 885.

On review, the Tennessee Supreme Court agreed with the trial court. In reaching its conclusion, the court expressly rejected Allstate's argument that the phrase "arising out of" is "sufficiently broad that it denotes the existence of *any* causal relationship." *Id.* The court reviewed other cases holding that coverage should be provided for injuries alleged to arise from both covered and non-covered causes and was ultimately "persuaded that there should be coverage in a situation . . . where a nonexcluded cause is a substantial factor in producing the damage or injury, even though an excluded cause may have contributed in some form to the ultimate result and, standing alone, would have properly invoked the exclusion contained in the policy." *Id.* at 887; *see also Clark v. Sputniks, LLC*, 368 S.W.3d 431, 441 (Tenn. 2012) ( "Tennessee recognizes the concurrent cause doctrine." (citing *Allstate*, 811 S.W.2d at 887)).

Applied here, it is clear that Mitchell's abuse of Arnold contributed "in some form" to the suffering Arnold experienced from continued exposure to Mitchell after the abuse had stopped and that continuing to see Mitchell would not have caused emotional distress "but for" the prior abuse. At the same time, the allegedly negligent conduct by church officials did not contribute to sexual misconduct, because the failure to report took place later, and at least some of the emotional suffering was allegedly related to the continued exposure itself, which was allegedly caused by

Cornerstone's failure to comply with its reporting obligation. In other words, there were arguably two proximate causes of Arnold's emotional injury: the sexual abuse that took place in the summer of 2008 and the continued presence of Mitchell at the church for the next two years, which allegedly resulted from the church's failure to comply with its reporting duty. Under *Allstate*, this was potentially a covered claim.

At this point in the litigation, the court finds that the removed Complaint adequately states a claim for breach of contract based on allegations that the 2016 complaint contained both covered and non-covered claims. In the absence of briefing on the issue of concurrent cause and without factual development regarding the messages that allegedly put Cornerstone on notice of potential sexual abuse, the course of the underlying litigation, or the language of the settlement agreement, the court will not dismiss the breach of contract claim.

2. *Bad Faith Breach of Contract*

Based on Tenn. Code Ann. § 56-7-105(a), Cornerstone claims that, in addition to damages in the amount of $500,000, GuideOne should be ordered to pay an additional 25% penalty "due to its bad faith in denying benefits under the Policy." (Doc. No. 1-2, at 4.) It also seeks the recovery of attorney's fees.

Under § 56-7-105(a), when an insurer refuses to pay a loss in bad faith, the insurer may be required to pay a penalty of up to 25% of the liability, in addition to the amount for which it is directly liable. To state a bad faith claim, a plaintiff must show that (1) payment under the policy of insurance has become due and payable; (2) the insured made a formal demand for payment; (3) the insured waited 60 days after making demand before filing suit (unless there was a refusal to pay prior to the expiration of the 60 days); and (4) the refusal to pay was not in good faith. *Ginn v. Am. Heritage Life Ins. Co.*, 173 S.W.3d 433, 443 (Tenn. Ct. App. 2004). "This statute is penal

in nature and must be strictly construed." *Minton v. Tenn. Farmers Mut. Ins. Co.*, 832 S.W.2d 35, 38 (Tenn. Ct. App. 1992).

The plaintiff has the burden of proving bad faith. *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 378 (6th Cir. 2007). The law is clear that a claim for bad faith refusal to pay cannot be sustained "when the insurer's refusal to pay rests on legitimate and substantial legal grounds." *Tyber v. Great Cent. Ins. Co.*, 572 F.2d 562, 564 (6th Cir. 1978); *accord Williamson*, 481 F.3d at 378; *Ginn*, 173 S.W.3d at 443. That is,

> [t]he bad faith penalty is not recoverable in every refusal of an insurance company to pay a loss. An insurance company is entitled to rely upon available defenses and refuse payment if there is substantial legal grounds that the policy does not afford coverage for the alleged loss. If an insurance company unsuccessfully asserts a defense and the defense was made in good faith, the statute does not permit the imposing of the bad faith penalty.

*Nelms v. Tenn. Farmers Mut. Ins. Co.*, 613 S.W.2d 481, 484 (Tenn. Ct. App. 1978) (citations omitted). To state a claim for bad faith, a plaintiff must allege "facts that tend to show 'a willingness on the part of the insurer to gamble with the insured's money in an attempt to save its own money or any intentional disregard of the financial interests of the plaintiff in the hope of escaping full liability.'" *Johnson v. Tenn. Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370 (Tenn. 2006) (quoting *Goings v. Aetna Cas. & Sur. Co.*, 491 S.W.2d 847, 849 (Tenn. Ct. App. 1972)).

In this case, GuideOne's actions do not remotely suggest a willingness to gamble with Cornerstone's money or an intentional disregard of Cornerstone's financial interests. To the contrary, as set forth above, GuideOne provided a defense, participated in the settlement negotiations, and has a substantial legal ground for arguing that the policy exclusion for sexual misconduct applies to the underlying Lawsuit. These facts alone indicate that GuideOne has not acted in bad faith. *See Woodland Park Baptist Church v. Selective Ins. Co. of S.C.*, No. 1:19-CV-280-TAV-SKL, 2020 WL 6992867, at *3 (E.D. Tenn. May 20, 2020) ("Plaintiff's first claim

alleges a violation of Tennessee Code Annotated § 56-7-105 because its insurer, Defendant, refused to pay its claim for reimbursement of the $1 million it contributed to the settlement of the underlying claim within sixty days of its demand. Defendant argues § 56-7-105 does not apply as a matter of law because Defendant acknowledged and defended the underlying claim. Defendant is correct.").

Regardless of whether GuideOne's defense is ultimately successful, the plaintiff has not alleged any facts that give rise to an inference of bad faith on the part of GuideOne. The claim for the statutory penalty under § 56-7-105 will, therefore, be dismissed.[3]

### 3. Promissory Estoppel

The removed Complaint in this case asserts that, "in reliance upon representations made by counsel for GuideOne to Cornerstone," Cornerstone entered into a settlement agreement with Arnold for $1,000,000, with $500,000 of that amount coming out of its own pocket. (Doc. No. 1-2 ¶ 8.) However, in making that payment, Cornerstone purportedly relied on

> representations by counsel for GuideOne that GuideOne would pay for coverage in the full amount of $500,000 for sexual misconduct by an agent of the church and for an additional $500,000 under the general liability limits which could be sought after the settlement in the Lawsuit was completed due to "time being of the essence to finalize said settlement and to avoid a trial."

(*Id.* ¶ 9.)

GuideOne apparently did not construe these allegations as attempting to assert a separate claim for relief but, instead, as part of the plaintiff's recitation of facts. In its Response to the Motion to Dismiss, however, Cornerstone asserts that the removed Complaint "alleges facts which constitute the elements of promissory estoppel," specifically citing paragraphs 8 and 9, referenced

---

[3] Because the only apparent basis for Cornerstone's claim for attorney's fees is § 56-7-105, dismissal of the bad faith claim also entails dismissal of the claim for attorney's fees.

above. (Doc. No. 15, at 3–4, 5–6.) The Response contains no further argument regarding the claim. In its Reply, GuideOne posits that the removed Complaint fails to state a colorable claim for promissory estoppel, because (1) there is a valid contract between the parties; (2) this is not an exceptional case warranting application of the doctrine, in particular because the plaintiff does not allege facts suggesting that GuideOne's conduct was fraudulent or "akin to fraud" (Doc. No. 16, at 8); and (3) the plaintiff does not allege that its purported reliance was justifiable or that injustice would occur if the alleged promise is not enforced.

The court agrees that the Complaint fails to state a claim for promissory estoppel. In Tennessee, under the doctrine of promissory estoppel, also called equitable estoppel and detrimental reliance, "[a] promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Shedd v. Gaylord Ent. Co.*, 118 S.W.3d 695, 699 (Tenn. Ct. App. 2003) (quoting *Alden v. Presley*, 637 S.W.2d 862 (Tenn. 1982)). To succeed on a promissory estoppel claim, a plaintiff must show "(1) that a promise was made; (2) that the promise was unambiguous and not unenforceably vague; and (3) that [the promisee] reasonably relied upon the promise to [its] detriment." *Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007) (citations omitted). Tennessee does not liberally apply the doctrine, instead limiting its application to "exceptional cases where to enforce the statute of frauds would make it an instrument of hardship and oppression, verging on actual fraud." *Shedd*, 118 S.W.3d at 700 (citations omitted) (emphasis added); *see also Chavez*, 245 S.W.3d at 407 ("Similarly to *Shedd*, there was no proof presented that [the defendant] was guilty of any conduct that verged on actual fraud, that it acted from improper motive, or that it gained an unconscionable advantage from its actions.").

Generally, promissory estoppel is "an alternative theory to recovery on an express contract." *Sparton Tech., Inc. v. Util-Link, LLC*, 248 F. App'x 684, 690 (6th Cir. 2007). Thus, when a contract exists, the doctrine typically does not apply. Tennessee courts have occasionally applied the doctrine even when the parties had a contract, but "these cases have been limited to cases where a claim of promissory estoppel was advanced to expand the terms of, not change the terms of, an existing contract. Where the parties have an enforceable contract, however, and merely dispute its terms, scope or effect, one party cannot obtain recovery based upon promissory estoppel." *Id.* (citations omitted).

In the insurance context, the Tennessee Supreme Court has expressly held that, where an insurance agent mistakenly promises "full coverage" for a particular type of loss as part of the inducement to enter into an insurance policy, such a promise can be binding even if the policy itself does not actually provide such coverage. *Bill Brown Const. Co., Inc. v. Glens Falls Ins. Co.*, 818 S.W.2d 1 (Tenn. 1991). More recently, the Tennessee Court of Appeals appears to have expanded this principle to apply when an insurance agent makes a mistake in authorizing work on an insured's property, when the policy does not actually provide coverage for the work. *See Clark v. Tenn. Farmers Mut. Ins. Co.*, No. E2019-00746-COA-R3-CV, 2020 WL 1900421, at *10 (Tenn. Ct. App. Apr. 17, 2020) ("If such insurance adjuster, acting as an agent on behalf of the insurance company, made a mistake by authorizing work on an insured's property when the policy does not provide coverage for the work, the agent's actions could bind the insurance company and estop the insurance company from denying financial responsibility for the work authorized by only the insurance company's agent and performed pursuant to that authorization.").

In this case, Cornerstone does not actually argue that either of these scenarios is parallel to its own situation. Hypothetically, however, if an agent of GuideOne mistakenly represented that

coverage under the CGL was available, even when it was not, and promised payment based on that erroneous assumption,[4] and Cornerstone relied on that representation in agreeing to the $1,000,000 settlement, *Clark* indicates that GuideOne could be bound by such a representation, notwithstanding the existence of a valid and binding contract. If, indeed, that is the claim that Cornerstone is attempting to make, the factual allegations in the removed Complaint are insufficiently specific to support it. Under both the Tennessee and Federal Rules of Civil Procedure, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see* Tenn. R. Civ. P. 9.02 ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."). In this case, although these facts are clearly within the plaintiff's possession, the allegations in the removed Complaint do not identify the speaker or what was actually said. The allegations are insufficiently specific to satisfy Rule 9.

Even if Rule 9 did not apply, the claim also fails to satisfy Rule 12(b)(6). To give rise to a claim for promissory estoppel, the alleged promise must be "unambiguous and not unenforceably vague," and the plaintiff's reliance on it must be reasonable. *Chavez*, 245 S.W.3d at 404. The purported promise in this case, as set forth in the removed Complaint, was that GuideOne would "pay for . . . an additional $500,000 under the general liability limits which could be sought after the settlement in the Lawsuit was completed." (Doc. No. 1-2 ¶ 9.) The plaintiff does not allege additional facts suggesting why its reliance on such a promise was reasonable. The reference to the plaintiff's ability to "seek" the additional $500,000 later makes the purported promise untenably ambiguous. Without further elaboration, the purported promise simply begs the question

---

[4] To be clear: the court is not making a finding that coverage under the CGL was not available. Rather, the promissory estoppel claim assumes, in the alternative to the breach of contract claim, that such coverage was not available.

why, if GuideOne agreed that the entire $1,000,000 was covered and payable under the policy, did it not simply fund the entire settlement amount.[5]

The court finds that the claim for promissory estoppel is inadequately pleaded, under both Rule 9(b) and Rule 12(b)(6). This claim will be dismissed without prejudice to the plaintiff's ability to seek permission to amend the removed Complaint to adequately plead this claim.

## IV. CONCLUSION

For the reasons set forth herein, the Motion to Dismiss (Doc. No. 8) will be granted in part and denied in part. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge

---

[5] The language of the removed Complaint is sufficiently vague that it suggests that the parties' intention was that each would pay $500,000 in order to quickly effectuate the settlement and then fight out post-settlement—as they are doing here—the disputed question of whether GuideOne was contractually on the hook for any settlement funds in excess of the $500,000 provided by the SML rider.